Rachel Lanier (SBN 343171)
Michael Akselrud (SBN 285033)
LANIER LAW FIRM, PC
2829 Townsgate Road, Suite 100
Westlake Village, CA 91361
Tel: 310.277.5100
Rachel.Lanier@LanierLawFirm.com
Michael.Akselrud@LanierLawFirm.com

**Attorneys for Plaintiffs**
**Milton and Danae Reynolds**

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MILTON AND DANAE REYNOLDS, | Case No: 3:23-CV-1632 |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR DAMAGES** |
| v. | (1) Strict Liability – Manufacturing Defect |
| EZRICARE, LLC; EZRIRX, LLC; GLOBAL PHARMA HEALTHCARE PRIVATE LIMITED; AMAZON.COM, INC.; AND "DOE" AMAZON DELIVERY SERVICE PARTNER, | (2) Strict Liability – Design Defect |
| | (3) Strict Liability – Failure to Warn |
| | (4) Negligence & Gross Negligence |
| | (5) Negligent Failure to Warn |
| | (6) Negligent Failure to Recall |
| Defendants. | (7) Breach of Implied Warranty |
| | (8) Fraud |
| | (9) Loss of Consortium |
| | **DEMAND FOR JURY TRIAL** |

1.     Subject to their Motion for Remand, challenging this Court's subject matter jurisdiction, and pursuant to Fed. R. Civ. P. 15(a)(1)(B), Plaintiffs file this First Amended Complaint.  Plaintiff Milton Reynolds files this Complaint having suffered blindness in his right eye from using contaminated EzriCare Artificial Tears. Plaintiff Danae Reynolds joins in this complaint having suffered loss of consortium because of Mr. Reynold's injuries.  On information and belief, the Reynolds allege as follows:

## PARTIES

2.     Plaintiffs Milton Reynolds and Danae Reynolds are a married couple. They are residents of San Leandro, California. At all times relevant to this lawsuit, Mr. and Mrs. Reynolds were residents of San Leandro, California. The injury for which Mr. and Mrs. Reynolds are suing occurred in San Leandro, California.

3.     Defendant Amazon.com, Inc. ("Amazon") is incorporated under the laws of Delaware and maintains its principal place of business in Washington. Amazon markets, sells, and distributes products worldwide, including in California. Amazon does business in California, both online and through its offices and operations in California. Amazon purposely directed its activities to California and sold, distributed, advertised, and/or marketed the product that caused injury giving rise to this lawsuit. Amazon's contacts with California are substantial and sufficient that the company should reasonably expect to be brought into court in California. Amazon has been served through its registered agent, Corporation Service Company, at 300 Deschutes Way SW, Ste. 208 M; C-CSC1, Tumwater, WA 98501.

4.     Defendant "Doe" is a currently unidentified Amazon Delivery Service Partner ("DSP") added pursuant to California Code of Civil Procedure 474. On information and belief, Defendant Doe is an independent, California company responsible for distributing packages "the last mile" from a California-based facility to California customers when those customers place orders from Defendant Amazon.[1] A search for California-based DSP jobs on ZipRecruiter returns 465 available positions at various DSP companies.[2] On information and belief, Defendant Doe was responsible for distributing and delivering the product that caused the injury in this lawsuit. Thus, Defendant Doe purposely directed its activities to California. Doe's contacts with California are

---

[1] *See Rimson v. Amazon Logistics, Inc.* (W.D. Mo., Jan. 25, 2023, No. 4:21-00553-CV-RK) 2023 WL 405336, at *1 (In its motion for summary judgment, Defendant Venus' statement of uncontroverted material facts explains that Amazon hires third-party companies, known as Delivery Service Partners ('DSP'), to deliver Amazon packages. Amazon has delivery stations, called DMCs, where the packages go for the last mile before they arrive to the customer."; *see also* Amazon, *Own Your Success: Start Your Own Business and Become an Amazon Delivery Service Partner, Delivering Smiles Across Your Community*, accessed Feb. 16, 2023, available at https://m media-amazon.com/images/G/01/DSP2022/assets/desktop/DSP_Brochure_English_V4.pdf.

[2]  ZipRecruiter, Amazon Delivery Partner Jobs (in California), accessed Feb. 16, 2023, available at https://www.ziprecruiter.com/Jobs/Amazon-Delivery-Partner/--in-California.

1 substantial and sufficient that the company should reasonably expect to be brought into court in

2 California.

3       5.    Defendant EzriCare, LLC ("EzriCare") is a limited liability company organized

4 under the laws of the State of New Jersey. EzriCare's principal place of business is located at 1525

5 Prospect St., Ste. 204, Lakewood, NJ  08701. EzriCare is a citizen of the State of New Jersey.

6 EzriCare is in the business of manufacturing, designing, importing, labeling, packaging, supplying,

7 distributing, marketing, and selling the product that caused the injury in this lawsuit throughout the

8 United States, including in California. Thus, EzriCare purposely directed its activities to California.

9 EzriCare's contacts with California are substantial and sufficient that the company should

10 reasonably expect to be brought into court in California. EzriCare has been served through its

11 registered agent, Ezriel Green, at 1525 Prospect St., Ste. 204, Lakewood, NJ  08701.

12       6.    Defendant EzriRx, LLC ("EzriRx") is organized under the laws of the State of

13 Delaware. EzriRx's principal place of business is located at 1525 Prospect St., Ste. 203, Lakewood,

14 NJ  08701 or 2360 Rt. 9, Suite 3, #171, Toms River, NJ 08755. EzriRx is in the business of

15 manufacturing, designing, importing, supplying, packaging, labeling, distributing, marketing, and

16 selling the product that caused injury in this lawsuit throughout the United States, including in

17 California. Thus, EzriRx purposely directed its activities to California. EzriRx's contacts with

18 California are substantial and sufficient that the company should reasonably expect to be brought

19 into court in California. EzriRx has been served through its registered agent Registered Agent

20 Solutions, Inc., 838 Walker Road, Suite 21-2, Dover, Delaware 19904.

21       7.    Defendant Global Pharma Healthcare Private Limited ("Global Pharma") is a

22 corporation organized and existing under the laws of the Country of India. Global Pharma's

23 principal place of business located at No. 2A, 3rd F, 4th Street, Ganga Nagar, Chennai - 600 024,

24 Tamilnadu, India. Global Pharma is in the business of manufacturing, designing,

25 importing/exporting, marketing, advertising, packing, labeling, distributing, and selling the product

26 that caused the injury that is the subject of this lawsuit. As can be seen on its website, Global

27

28

Pharma purposely directed its activities to the U.S. market, including California.[3]  Global Pharma's contacts with California are substantial and sufficient that the company should reasonably expect to be brought into court in California. Global Pharma is in the process of being served through its offices and through its officers via the Hague Service Convention.

8.     Each Defendant received direct financial benefit from its activities and the sale of the product at issue in this lawsuit. Each Defendant was integral to the business enterprise such that Defendants' conduct was a necessary factor in bringing the product to the customer market. Each Defendant had control over or a substantial ability to influence the distribution and marketing process.

## JURISDICTION AND VENUE

9.     As noted in Plaintiffs' Motion for Remand, this Court lacks subject matter jurisdiction in this case, and it should be remanded to California state court.

10.    This court has personal jurisdiction over each Defendant because, on information and belief, each Defendant conducts business in this state, has purposely availed itself of the laws of this state, and purposely directed its business to the state.  Moreover, the injuries that are the subject of this lawsuit were caused by a product that was sold, distributed, delivered, used, and caused injury to the Plaintiffs in Alameda County.  Thus, the controversy arises out of Defendants contacts with the state and the forum.

11.    Venue lies in Alameda County because the conduct and events giving rise to the claims at issue occurred in Alameda County. The Plaintiffs reside in this county, the purchase and injuries occurred in the county, and relevant evidence and witnesses are believed to be located in the county.

12.    Plaintiffs expressly disclaim that any of their causes of action rely upon federal law and/or present a federal question.

---

[3]  Global Pharma Healthcare, Our Presence, accessed Feb. 16, 2023, available at  https://global-pharma.com/ourpresence.html.

FIRST AMENDED COMPLAINT FOR DAMAGES

## FACTS OF THE CASE

13.     Through the Christmas of 2022, Plaintiff Milton Reynolds was battling an eye infection so severe that he feared doctors would have to remove his right eye.  The infection melted his cornea, causing him to endure, among other things, emergency room visits, two surgeries, and regular intravitreal injections (shots in his eye).  Ultimately, Mr. Reynolds went blind in his right eye.

14.     In January 2023, Mr. Reynolds received a call from the Alameda County Office of Public Health, inquiring about Mr. Reynolds' injuries and whether he had purchased EzriCare Artificial Tears.  That was when he learned that his suffering and blindness was caused by simple, lubricating eye drops that he bought on Amazon.

### *The Outbreak – Pseudomonas Aeruginosa*

15.     On January 20, 2023, the US Center for Disease Control and Prevention ("CDC") spotted an outbreak of a rare bacterial infection in 11 (now 12) different states, including California.[4]   At the time, the infections were known to have affected 55 people between May and December of 2022.[5]  Some of the people infected suffered permanent vision loss, and one person even died when the infection entered his bloodstream.[6]

16.     The CDC searched for a cause of the outbreak and found one:   "Recent epidemiology and laboratory evidence link these infections to use of EzriCare Artificial Tears."[7] The CDC obtained bacterial samples from the people infected and reported that it found a strain of bacteria that has never been reported in the United States, called Verona Integron-mediated Metallo-β-lactamase and Guiana-Extended Spectrum-β-Lactamase producing carbapenem-resistant *Pseudomonas aeruginosa* ("VIM-GES-CRPA").[8]  The CDC then compared that strain of bacteria to

---

[4] Center for Disease Control and Prevention ("CDC"), Update: Multistate Cluster of VIM- and GES-producing Carbapenemresistant *Pseudomonas aeruginosa* associated with Artificial Tears, Jan. 20, 2023, available at https://www.aao.org/Assets/3a187c94-7889-42e8-84a1-6b2e88e7d374/638098403609770000/epix-multistate-pseudomonas-investigation-20jan2023-pdf?inline=1. The states affected were CA, CO, CT, FL, NJ, NM, NY, NV, TX, UT, WA, and WI.
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] CDC, Outbreak of Extensively Drug-resistant *Pseudomonas aeruginosa* Associated with Artificial Tears, Feb. 1, 2023, available at https://emergency.cdc.gov/han/2023/han00485.asp.

the bacteria collected from opened bottles of EzriCare Artificial Tears – they were the same bacteria.[9]  Testing of unopened bottles of EzriCare Artificial Tears is ongoing.[10]

17.    Both the CDC and the Food and Drug Administration ("FDA") have advised citizens to stop using Artificial Tears, because the strain of *Pseudomonas aeruginosa* bacteria that they found in the outbreak is a danger to humans. For example, scientists have known for decades that, when *Pseudomonas aeruginosa* is introduced into the eye, "as . . . in contaminated medicines, it acts with **extreme virulence**, in many cases causing blindness and even necessitating enucleation." [11] "Enucleation" means surgical removal of the entire eyeball.

18.    The strain of *Pseudomonas aeruginosa* found in the outbreak is reported to be "extensively drug-resistant," making it especially difficult for doctors to treat.[12]  The strain appears to resist cefepime, ceftazidime, piperacillin-tazobactam, aztreonam, carbapenems, ceftazidime-avibactam, ceftolozane-tazobactam, fluoroquinolones, polymyxins, amikacin, gentamicin, and tobramycin.[13]

### *The Aftermath of the Outbreak*

19.    Four days after the CDC issued its public statement specifically linking the potentially-deadly *Pseudomonas aeruginosa* to EzriCare, EzriCare reported on its website that the CDC was merely investigating "adverse events" related to "various" over the counter eye drops. Moreover, although infections had been under investigation by the CDC for approximately nine months, EzriCare disclaimed that it had received *any* consumer complaints or adverse event reports, and the company reported that it had not been asked to recall Artificial Tears.[14]

20.    Several days after that, on February 1, 2023, EzriCare issued a statement all but blaming the bacterial contamination of Artificial Tears on its manufacturer, Global Pharma Healthcare, and/or its distributor, Aru Pharma:

---

[9] *Id.*

[10] *Id.*

[11] William H. Spencer, *Pseudomonas Aeruginosa Infections of the Eye*, Calif Med. 1953 Dec; Vol. 79(6) at 438–443., available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1521875/ (emphasis added).

[12] CDC, Outbreak of Extensively Drug-resistant *Pseudomonas aeruginosa* Associated with Artificial Tears, Feb. 7, 2023, available at https://www.cdc.gov/hai/outbreaks/crpa-artificial-tears.html.

[13] *Id.*

[14] EzriCare, EzriCare Artificial Tears - Discontinue Use, Jan. 24 – Feb. 2, 2023, available at https://ezricare-info.com/

> The EzriCare Artificial Tears product is manufactured in India by Global Pharma
> Healthcare PVT Limited and imported into the United States by Aru Pharma Inc. . . .
> EzriCare, LLC had no role in the formulation, packaging delivery system design or
> actual manufacturing of this product.[15]

Though, in that same statement, EzriCare did specifically own that it is responsible for the labeling and marketing of Artificial Tears: "EzriCare, LLC's only role in introducing the product to the market was to design an exterior label and to market it to our customers."[16]

21.    On February 2, 2023, Global Pharma Healthcare issued a nationwide recall of Artificial Tears distributed by EzriCare "due to possible contamination."[17]    The recall's risk statement specifically acknowledges that "[u]se of contaminated artificial tears can result in the risk of eye infections that could result in blindness."[18]

22.    On February 3, 2023, the FDA placed Global Pharma Healthcare on import alert, preventing Artificial Tears from entering the country, finding evidence that Artificial Tears appeared to be in violation of U.S. laws and regulations.[19]    The FDA cited Global Pharma Healthcare for "not complying with [Current Good Manufacturing Practice] requirements," as well for providing an inadequate response to FDA records requests.[20]

23.    Between February 20 and March 2, 2023, the FDA inspected Global Pharma's manufacturing facilities in India.  As a result of that investigation, the FDA released a report stating that Global Pharma used manufacturing processes for Artificial Tears that lacked the assurance of product sterility.[21]

---

[15] *Id.*
[16] *Id.*
[17] Global Pharma Healthcare, Global Pharma Healthcare Issues Voluntary Nationwide Recall of Artificial Tears Lubricant Eye Drops Due to Possible Contamination, Feb. 2, 2023, available at http://www.global-pharma.com/otc.pdf.
[18] [18] *Id.*
[19] Food and Drug Administration, FDA Warns Consumers Not to Purchase or Use EzriCare Artificial Tears Due to Potential Contamination, Feb. 2, 2023, available at https://www.fda.gov/drugs/drug-safety-and-availability/fda-warns-consumers-not-purchase-or-use-ezricare-artificial-tears-due-potential-contamination.
[20] *Id.*
[21] Department of Health and Human Services – Food and Drug Administration, Global Pharma Inspection Observations, March 2, 2023, available at https://www.fda.gov/media/166739/download.

_**Artificial Tears & Violations of California Law**_

24.     California law forbids violations of Current Good Manufacturing Practice ("CGMP") requirements. Through the state's Sherman Food Drug and Cosmetics Laws ("Sherman Laws"), California has adopted as its own law all nonprescription drug regulations and good manufacturing practices found in the federal Food, Drug, and Cosmetic Act (21 U.S.C. Sec. 301 _et seq_, 21 C.F.R. 820 _et seq._). E.g. Cal. Health & Safety Code §§ 110111, 110105. Thus, California law requires sanitary conditions at the manufacturing facility (including packaging or similar facilities) and testing to ensure that eye drops will be sterile and safe when used by the consumer.

25.     Among CGMP violations that the FDA cited were (1) lack of appropriate microbial testing and (2) a formulation issue (the fact that the company packages the eye drops in multi-use bottles without a preservative). Although investigation currently remains ongoing, these are the ways that the bacteria _Pseudomonas aeruginosa_ came to contaminate Artificial Tears.

26.     On information and belief, because of unsanitary conditions, the lack of appropriate microbial testing, and the lack of adequate documentation and pharmacovigilance, _Pseudomonas aeruginosa_ contaminated Artificial Tears at the time of manufacturing or packaging. The CDC's investigation remains ongoing.

27.     Global Pharma knows the danger presented by unsanitary conditions and the lack of microbial testing. Its website touts that its "manufacturing process is studied and perfected by a quality control department in order to ensure that Global Pharma formulations are of the highest quality."[22] "Our team of dedicated professionals, with the help of computer controlled test equipment, scrutinize each product as it goes through a series of checkpoints."[23] "A separate quality assurance team monitors the entire process of production. Our laboratory is equipped with the latest equipment . . . . It is well equipped to perform all necessary chemical and microbiological assays."[24] "We at Global Pharma are committed to ensure our products are of the highest quality and pharmacovigilance is an essential part of this. Our ongoing processes allow for feedback to be

---

[22] Global Pharma Healthcare, Quality and Pharmacovigilance, visited Feb. 21, 2023, http://www.global-pharma.com/quality.html.
[23] _Id._
[24] _Id._

received and acted upon in a timely and efficient manner."[25] More specifically, Global Pharma touts that its manufacturing facility "has been meticulously designed for the manufacturing of . . . sterile eye drops . . . . It has been audited by the Ministries of Health of over 12 countries . . . ."[26]

28.     Similarly, EzriCare's website touts itself as a "forward-thinking 21st century, Generic OTC Drug Company" whose "products have the same high quality active ingredients as most leading brands."[27]  "We pride ourselves on providing our customers the biggest bang for their buck while also ensuring they remain highly satisfied in . . . our product quality . . . ."[28]

29.     The dangers of unsanitary conditions and the need for testing, pharmacovigilance, and company oversight of drug manufacturing facilities in India has long been known to industry members like Defendants EzriCare, EzriRx, and Global Pharma.  For example, a 2015 article in the Financial Times, titled *Indian Drugs:  Not What the Doctor Ordered* reported that, in 2015 alone, six Indian manufacturers were blacklisted by the FDA and that 39 drug-manufacturing facilities – owned by 27 different companies – lost their clearance to make drugs for U.S. markets because of regulatory problems.[29]  Such "regulatory problems" have very real and very steep consequences: for example, in October of last year, contaminated, Indian-made cough syrup killed 70 children in West Africa.[30] This is not a one-time problem; activists say there is a "longstanding laxness in regulating India's booming pharmaceutical industry."[31]

30.     Thankfully, companies that deal in pharmaceuticals sold in America are held to a higher standard.  California law recognizes, for example, that "[i]nformed medical opinion is in agreement that all preparations offered or intended for ophthalmic use . . . should be sterile." *Id.* (incorporating 21 C.F.R Parts 200.50, 211). "It is further evident that such preparations purport to

---

[25] *Id.*
[26] Global Pharma Healthcare, Manufacturing, visited Feb. 21, 2023, available at https://global-pharma.com/manufacturing html.
[27] EzriCare, About Us, visited Feb. 21, 2023, available at https://ezricare.com/pages/about-us.
[28] *Id.*
[29] Financial Times, *Indian Drugs:  Not What the Doctor Ordered*, Sep. 2015, available at https://www.ft.com/content/de0ca3f4-5581-11e5-97e9-7f0bf5e7177b.
[30] NPR, *Contaminated Cough Syrup from India Linked to 70 Child Deaths. It's Happened Before.*, Oct. 2022, available at https://www.npr.org/sections/goatsandsoda/2022/10/18/1128530220/contaminated-cough-syrup-from-india-linked-to-70-child-deaths-its-happened-befor.
[31] *Id.*

1  be of such purity and quality as to be suitable for safe use in the eye." *Id.*  "[A]ll such preparations,

2  if they are not sterile, fall below their professed standard of purity or quality and may be unsafe."

3  *Id.* Testing is likewise required to ensure safety. *Id.*

4      31.    Alternatively, on information and belief, because of a formulation issue – namely,

5  that Artificial Tears was placed in *multi-use* bottles and without a preservative to kill bacteria –

6  *Pseudomonas aeruginosa* foreseeably contaminated the bottles of Artificial Tears after they were

7  opened, even though they were used as directed.  Medical professionals have long warned that

8  placing a preservative-free eyedrop inside a multi-use eyedrop bottle is dangerous, precisely

9  because there is no preservative to kill bacteria; even seemingly benign and foreseeable acts – like

10 brushing an eyelash while applying the drops – can cause harmful contamination of the multi-use

11 bottle when it lacks a preservative.  When no preservative is added to eye drops, the drops must be

12 packaged more safely, for example, in single-use vials or specially-designed multi-use bottles (that

13 prevent drops and air from reentering and contaminating the bottle).

14     32.    California's Sherman Laws require that EzriCare's eye drops be packaged more

15 safely.  If eye drops are sold in a multi-dose container, like EzriCare's, they must either contain a

16 substance to inhibit the growth of microorganisms *or* "be so packaged as to volume and type of

17 container and so labeled as to duration of use and with such necessary warnings to afford adequate

18 protection and minimize the hazard of injury resulting from contamination during use."  Cal. Health

19 & Safety Code §§ 110111, 110105 (incorporating 21 C.F.R. 200.50(b)).  To this end, notably, the

20 brand-name eye drops, Refresh Plus (for which EzriCare is the generic), are sold in *single-use* vials,

21 pictured below – *not* a multidose bottle, like Artificial Tears.




FIRST AMENDED COMPLAINT FOR DAMAGES

1    33.    Especially given the manufacturing and formulation issues inherent in Artificial

2    Tears, EzriCare's warning label was particularly weak. It warned not to use the product if the

3    solution changed color or became cloudy; to see a doctor if the user experienced eye pain, changes

4    in vision, or redness/irritation; and it stated that contamination *could be avoided* by not touching the

5    tip of the container to any surface, replacing the cap, and removing contact lenses before using.  The

6    label did not warn, for example, because the product is preservative-free and irresponsibly packaged

7    it is more susceptible to contamination and more likely to cause serious, life-altering infections.

8    *Plaintiffs Milton Reynolds & Danae Reynolds*

9    34.    Like many Americans, Plaintiff Milton Reynolds gets dry eyes when he works on a

10   computer.  He decided to purchase some lubricating eye drops.  Sadly, that seemingly-innocuous

11   decision would change his life.

12   35.    On June 24, 2022, Mr. Reynolds purchased two bottles of EzriCare Artificial Tears

13   from Amazon.  In August or September of the same year, he began using the eye drops.  He used

14   the Artificial Tears dozens of times.  Then, his right eye inexplicably began to tear up, and he began

15   experiencing eye pain.

16   36.    In October 2022, Mr. Reynolds visited his ophthalmologist for treatment of his

17   symptoms.  His ophthalmologist sent him to the emergency room.  Mr. Reynolds was experiencing

18   "cornea melt" – an infection was eating his cornea.

19   37.    Through Thanksgiving 2022, Mr. Reynolds continued receiving critical medical

20   treatment for his eye, including (but not limited to) shots in his right eye and emergency room visits.

21   On two occasions, doctors glued his right eyeball together to keep the eye from imploding from the

22   infection.  Mr. Reynolds compared the physical pain caused by the infection to knives sticking into

23   his head.  The doctors advised Mr. Reynolds that they may need to remove his infected eyeball.

24   38.    On the day after Thanksgiving, Mr. Reynolds underwent surgery for a full cornea

25   replacement.  Around that time, Mr. Reynolds' doctors confirmed that Mr. Reynolds was suffering

26   from a rare strain of *Pseudomonas aeruginosa*.

27   39.    However, Mr. Reynolds' suffering was not over:  He endured a second surgery to

28   clear the back of his eye.  His injuries continued to force him into the emergency room.  And Mr.

1  Reynolds continued to visit his doctors frequently for critical treatment, including more shots in his

2  eye.

3       40.    Mr. Reynolds has lost sight in his right eye.  He continues to see doctors.  Mrs.

4  Reynolds, his wife, must both see her husband suffer and participate in his care and treatment,

5  which is emotionally and physically taxing and puts a strain on the relationship.  Ms. Reynolds can

6  no longer sleep in the same bed with Mr. Reynolds for fear of exacerbating his injury.   The

7  Reynolds have been negatively impacted by loss of companionship, comfort, care, assistance,

8  protection, affection (both physical and emotional), society, and moral support.  Mr. Reynolds has

9  experienced severe pain and suffering, both physical and emotional, and he will continue to require

10 treatment in the future.

11 *Defendant Amazon & "Doe" Amazon DSP*

12      41.    Defendant Amazon markets, sells, and distributes products worldwide, including in

13 California.  Amazon advertised, marketed, sold, and/or distributed the Artificial Tears that injured

14 Mr. Reynolds in this case.  On information and belief, Amazon stored the product in its warehouses,

15 facilitated message boards for the product, and returns were made through Amazon.   Although

16 Amazon sold the product through its website, Amazon has removed the page and the product,

17 including advertisements and accompanying message boards so that they are no longer publicly

18 available by searching.

19      42.    Defendant "Doe" Amazon Delivery Service Partner ("DSP") is one of Amazon's

20 business partners.   Amazon DSPs are exactly what the name implies:   companies that operate

21 exclusively in connection with Amazon to distribute Amazon's products "the last mile" to Amazon's

22 customers.[32]   Amazon encourages individuals to launch their own DSPs to serve as Amazon

23 distributors.[33]

24

25

26 [32] Amazon, *Own Your Success:  Start Your Own Business and Become an Amazon Delivery Service Partner, Delivering*

27 *Smiles Across Your Community*, accessed Feb. 16, 2023, available at
   https://m media-amazon.com/images/G/01/DSP2022/assets/desktop/DSP_Brochure_English_V4.pdf; *Rimson v. Amazon*

28 *Logistics, Inc.* (W.D. Mo., Jan. 25, 2023, No. 4:21-00553-CV-RK) 2023 WL 405336, at *1 ("the last mile").

[33] *Id.*

FIRST AMENDED COMPLAINT FOR DAMAGES

1    43.    As demonstrated by the below graphics from Amazon's website, DSPs are all but

2  formally part of Amazon.[34]    Amazon provides their DSPs with training, vehicles, uniforms,

3  equipment, operations manuals, logistics support, insurance, payroll and accounting services, legal

4  support, and compliance support.[35]    On information and belief, vehicles and uniforms carry the

5  Amazon logo.  Amazon maintains delivery stations, called DMCs, where the packages are stored

6  before Amazon DSPs take them to the customer.[36]    Amazon business coaches check in *weekly* with

7  the DSP to provide business coaching.[37]

8

## What to expect

Launching a business becomes that much easier with Amazon's
delivery volume and resources behind you.

### WHAT YOU DO

**Set up your business**
You can leverage a suite of exclusive Amazon-negotiated deals to start your business, and work with our network of top-in-class service providers to keep your operation rolling.

**Build your team**
You're a coach. This is your team. Your most important responsibility is recruiting and retaining solid drivers and helpers who will enable your ongoing success.

**Deliver packages**
Your team of delivery associates will operate a fleet of delivery vehicles, serving thousands of customers.

**Create your team culture**
You lead with a can-do attitude that ensures your business reflects Amazon's high standards and customer-obsessed culture. Coach, develop, and motivate your team to exceed expectations on every delivery.

**Grow your business**
Deliver a great customer experience and get the opportunity to hire more people, deliver more packages, and grow your business.

### WHAT WE DO

**Get you started**
Exclusive deals on Amazon-branded delivery vehicles, comprehensive insurance, industrial-grade hand-held devices, and other services help you get your delivery business up and running

**Provide training**
You'll have hands-on training starting with an introduction to Amazon followed by time in a delivery station environment to learn from other DSPs.

**Supply a comprehensive toolkit**
We give you the tools and technology you'll need to run your business, designed to keep your operation running smoothly.

**Offer on-demand support**
Owners receive ongoing support from Amazon, including a comprehensive operations manual, driver assistance for on-road issues, and a dedicated Business Coach.

**Share our experience**
Amazon brings more than 25 years of technology and logistics experience to guide you in one of the fastest growing industries in the world.

---

[34] *Id.*
[35] *Id.*
[36] *Rimson,* 2023 WL 405336 at *1.
[37] *Supra note 32.*

FIRST AMENDED COMPLAINT FOR DAMAGES

   

Amazon branded vehicles customized for delivery        Vehicle maintenance and insurance        Fuel program        Professional uniforms

   

Industrial-grade handheld devices        DOT compliance services        Recruitment tool discounts        Payroll, tax, and accounting services

 

Health benefits and employee services        Legal support        Dedicated Business Coach

44.     Further, an online job search for California-based Amazon DSPs returns 465 positions at various, California-based companies.[38]

45.     On information and belief, Defendant Doe Amazon DSP was responsible for distributing and delivering the product that caused the injury in this lawsuit.

*Defendants EzriCare and EzriRx*

46.     Defendant EzriCare is named as the distributor of Artificial Tears on the product's packaging, pictured below, and EzriCare has publicly admitted to creating the labeling for the product, as well as to marketing the product.[39]

---

[38] ZipRecruiter, Amazon Delivery Partner Jobs (in California), accessed Feb. 16, 2023, available at https://www.ziprecruiter.com/Jobs/Amazon-Delivery-Partner/--in-California
[39]     EzriCare     Artificial     Tears     Box     &     Label,     available     at https://dailymed nlm nih.gov/dailymed/fda/fdaDrugXsl.cfm?setid=ac1ea23c-f1c6-418f-921e-58553ee919cb&type=display; EzriCare, EzriCare Artificial Tears - Discontinue Use, Jan. 24 – Feb. 2, 2023, available at https://ezricare-info.com/.

FIRST AMENDED COMPLAINT FOR DAMAGES



47.     On information and belief, Defendant EzriRx also participated in the marketing and distribution of Artificial Tears.  EzriRx is in the business of selling/distributing pharmaceutical products between product wholesalers and businesses by direct marketing to pharmacies and by use of an online platform to sell to pharmacies.[40]  Artificial Tears is one of the products EzriRx markets, sells, and distributes.   As shown below, EzriRx's Facebook page displays a photograph of a conference where EzriRx's booth displayed Defendant EzriCare's products, including EzriCare's Artificial Tears.[41]

---

[40] EzriRx, About Us, accessed June 5, 2023, available at https://www.ezrirx.com/about/.
[41]     EzriRx     Facebook     Page     Photo,     accessed     June     5,     2023,     available     at https://www.facebook.com/photo.php?fbid=536715591791417&set=t.10005439352519&type=3.







48.     Similarly, EzriRx's Instagram page promoted EzriCare's over-the-counter line,[42] and a photo (now deleted) on EzriCare's Instagram page shows that its over-the-counter line includes EzriCare Artificial Tears.[43]

---

[42]     EzriRx     Instagram     Page,     accessed     June     5,     2023,     available     at
https://www.instagram.com/p/Cc3aNcuORCo/?utm_source=ig_web_copy_link&igshid=MzRIODBiNWFlZA==.
[43] Now-Deleted EzriCare Instagram Photo (pictured herein).



49.     EzriRx specifically directed its activities to California.  For example, the company admitted in a pleading in a class-action lawsuit that EzriRx specifically calls pharmacies across the country and in California in particular to market and sell products.[44]  An excerpt from that pleading details a conversation between EzriRx and California Pharmacy:

- "EzriRx Agent: Hi there, Travis.  I'm calling on behalf of EzriRx on a recorded line, and I'd like your consent to send some advertising material to your fax number.  Is that okay?
  Caller 1:  Sure."  Dkt. # 20-4 at 3:8-24 (California Pharmacy).

---

[44] Brief in Support of Defendant's Motion to Strike Class Allegations or Deny Class Certification, dkt. 29 p. 5., *Boone's Pharmacy Inc. v. EzriRx LLC*, No. 2:2022 cv 00375 (S.D. Alabama).

FIRST AMENDED COMPLAINT FOR DAMAGES

1   Thus, on information and belief, EzriRx marketed to businesses located in California, made internet

2   sales to businesses and residents located in California, and entered into business dealings with

3   California businesses and residents, including use of EzriRx's web platform by California residents.

4       50.    EzriCare and EzriRx are both apparent manufacturers of Artificial Tears.  Both

5   companies are founded by, headed by, and presumably named after a young man named Ezriel

6   Green.  EzriRx owns the trademark for EzriCare, which is the trademark used to identify EzriCare

7   as the distributor on the Artificial Tears packaging.[45] As discussed above, EzriRx also participated

8   substantially in the marketing and distribution of EzriCare Artificial Tears.  And, through April 4,

9   2023, the customer support and contact email for EzriCare listed on its website (which has now

10  been removed) was via EzriRx:  EzriCare@EzriRx.com.[46]  EzriCare and EzriRx also had the same

11  customer support and contact phone numbers.[47]

12      51.    EzriCare and EzriRx did not disclose the true manufacturer of Artificial Tears on the

13  product labeling, which is permitted by federal regulations.  *See* 21 C.F.R. 201.(h)(5) ("If the

14  distributor is named on the label, the name shall be qualified by one of the following phrases: . . .

15  'Manufactured by _____ for _____', 'Manufactured for _____ by _____' . . . ." ).

16      52.    Clips from EzriCare's website, pictured below, show that the EzriCare prominently

17  touts that it "develop[s] quality generics" that "always exceed expectations" and "make[s] generics"

18  that are "effective, safe and transparent."[48]  Also pictured below, EzriCare also provides a "quality

19  assurance" and touts that it is registered with the FDA, is in compliance with state and federal laws,

20  and is insured.[49]

21

22

23

24

25

[45] United States Patent and Trademark Office EzriCare Trademark Search, accessed June 5, 2023, available at
26   https://tmsearch.uspto.gov/bin/showfield?f=doc&state=4809:vtv97r.2.1.
[46] Wayback Machine, EzriCare.com, available at  https://web.archive.org/web/20230331170230/https://ezricare.com/.
27   [47] *Compare*  Wayback  Machine,  EzriCare.com,  accessed  June  5,  2023,  available  at
https://web.archive.org/web/20230331170230/https://ezricare.com/ *to* EzriRx, Contact Us, accessed June 5, 2023,
available at https://www.ezrirx.com/contact/.
28   [48] Wayback Machine, EzriCare.com, available at  https://web.archive.org/web/20230331170230/https://ezricare.com/.
[49] *Id.*

FIRST AMENDED COMPLAINT FOR DAMAGES

1

2



3

4

5

6

7

8

9

10



11

12

13

14

15    53.    From all of this, a reasonable consumer would have believed that EzriCare or EzriRx

16    manufactured the product, and Mr. Reynolds did believe that EzriCare manufactured the product.

17    *Defendant Global Pharma*

18    54.    Defendant Global Pharma is in the business of manufacturing, designing,

19    importing/exporting, distributing, and selling the product that caused the injury that is the subject of

20    this lawsuit. Between February 20 and March 2, 2023, the US FDA inspected Global Pharma's

21    manufacturing facilities where the outbreak of pseudomonas aeruginosa may have originated.  As a

22    result of that investigation, the FDA released a report stating that Global Phama used manufacturing

23    processes that lacked assurance of product sterility.[50]

24

25

26

27

_____

28    [50] Department of Health and Human Services – Food and Drug Administration, Global Pharma Inspection Observations, March 2, 2023, available at https://www.fda.gov/media/166739/download.

FIRST AMENDED COMPLAINT FOR DAMAGES

## CAUSES OF ACTION

### Count I

### Strict Liability – Manufacturing Defect

55.     Mr. & Mrs. Reynolds incorporate the preceding paragraphs 2-8 and 13-54 by reference as though set forth here in their entirety.

56.     Defendants are the manufacturers or apparent manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers of the product Artificial Tears. Global Pharma manufactured, designed, packaged, supplied, distributed, and sold the product; EzriCare and EzriRx were apparent manufacturers, packaged, labeled, marketed, advertised, supplied, distributed, and sold the product, and EzriRx owned the EzriCare trademark; Amazon marketed, advertised, distributed, and sold the product; Doe Amazon DSP distributed the product. Each Defendant received direct financial benefit from its activities and the sale of the product at issue. Each Defendant was integral to the business enterprise such that Defendants' conduct was a substantial and/or necessary factor in bringing the product to the customer market. Each Defendant had control over or a substantial ability to influence the distribution and marketing process.

57.     The product was defective in that it was contaminated with *Pseudomonas aeruginosa*. Because it was contaminated, it differed from the manufacturer's design or specifications or from other typical units of the same product line.  The product was defective when it left Defendants' possession.  Mr. Reynolds used Artificial Tears in a reasonably foreseeable manner.  He believed EzriCare was the manufacturer.  He and Ms. Reynolds suffered harm, and the defect in the product was a substantial factor in causing that harm.

58.     On information and belief, certain Defendants acted with malice, oppression, or fraud – including, but not limited to, acting with willful and knowing disregard for the rights or safety of others, for example, including but not limited to:  Global Pharma, EzriCare, and EzriRx failed to implement protocols to ensure that the product was safe and sterile, while simultaneously representing that the product was safe and in compliance with FDA regulations.  These Defendants had awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid those consequences.

**Count II**

**Strict Liability – Design Defect**

59.     Mr. & Mrs. Reynolds incorporate the preceding paragraphs 2-8 and 13-54 by reference as though set forth here in their entirety.

60.     Defendants are the manufacturers or apparent manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers of the product Artificial Tears. Global Pharma manufactured, designed, packaged, supplied, distributed, and sold the product; EzriCare and EzriRx were apparent manufacturers, packaged, labeled, marketed, advertised, supplied, distributed, and sold the product, and EzriRx owned the EzriCare trademark; Amazon marketed, advertised, distributed, and sold the product; Doe Amazon DSP distributed the product. Each Defendant received direct financial benefit from its activities and the sale of the product at issue. Each Defendant was integral to the business enterprise such that Defendants' conduct was a substantial and/or necessary factor in bringing the product to the customer market. Each Defendant had control over or a substantial ability to influence the distribution and marketing process.

61.     The product's design was defective because it enabled the product to be contaminated with *Pseudomonas aeruginosa* and, thus, did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way. Alternatively, the design was defective because it enabled the product to be contaminated with *Pseudomonas aeruginosa* and the risks associated with the product's design outweighed its benefits. Mr. Reynolds believed that EzriCare manufactured the product.  Mr. and Ms. Reynolds were harmed. The product's design or failure to perform safely was a substantial factor in causing the harm suffered by Mr. and Ms. Reynolds.

62.     On information and belief, certain Defendants acted with malice, oppression, or fraud – including, but not limited to, acting with willful and knowing disregard for the rights or safety of others, for example, including but not limited to:  Global Pharma, EzriCare, and EzriRx failed to implement protocols to ensure that the product was safe and sterile, while simultaneously representing that the product was safe and in compliance with FDA regulations.  These Defendants had awareness

FIRST AMENDED COMPLAINT FOR DAMAGES

1  of the probable dangerous consequences of their conduct and deliberately failed to avoid those

2  consequences.

### Count III

### Strict Liability – Failure to Warn

63.   Mr. & Mrs. Reynolds incorporate the preceding paragraphs 2-8 and 13-54 by reference as though set forth here in their entirety.

64.   Defendants are the manufacturers or apparent manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers of the product Artificial Tears. Global Pharma manufactured, designed, packaged, supplied, distributed, and sold the product; EzriCare and EzriRx were apparent manufacturers, packaged, labeled, marketed, advertised, supplied, distributed, and sold the product, and EzriRx owned the EzriCare trademark; Amazon marketed, advertised, distributed, and sold the product; Doe Amazon DSP distributed the product. Each Defendant received direct financial benefit from its activities and the sale of the product at issue. Each Defendant was integral to the business enterprise such that Defendants' conduct was a substantial and/or necessary factor in bringing the product to the customer market. Each Defendant had control over or a substantial ability to influence the distribution and marketing process.

65.   The product had potential risks, side effects, or adverse reactions that were known or knowable in light of the scientific and/or medical knowledge at the time of the product's manufacture, distribution, packaging, labeling, supplying, marketing, advertising, and/or selling – for example, that it may be contaminated with a potentially-deadly bacteria.  The potential risks, side effects, and/or adverse reactions presented a substantial danger when the product was used or misused in an intended or reasonably foreseeable way. Ordinary consumers would not have recognized the potential risks, side effects, or adverse reactions. Defendants had a duty to warn and to continually update warnings. Defendants failed to adequately warn or instruct or update the potential risks, side effects, or adverse reactions. Mr. Reynolds believed that EzriCare manufactured the product.  Mr. and Ms. Reynolds were harmed. The lack of sufficient instructions or warnings was a substantial factor in causing the harm that Mr. and Ms. Reynolds suffered.

66.     On information and belief, certain Defendants acted with malice, oppression, or fraud – including, but not limited to, acting with willful and knowing disregard for the rights or safety of others, for example: Global Pharma, EzriCare, and EzriRx failed to implement protocols to ensure that the product was safe and sterile, while simultaneously representing that the product was safe and in compliance with FDA regulations.  These Defendants had awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid those consequences.

### Count IV

### Negligence & Gross Negligence

67.     Mr. & Mrs. Reynolds incorporate the preceding paragraphs 2-8 and 13-54 by reference as though set forth here in their entirety.

68.     Global Pharma, EzriCare, and EzriRx are the manufacturers or apparent manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers of the product Artificial Tears.  Global Pharma manufactured, designed, packaged, supplied, distributed, and sold the product; EzriCare and EzriRx were apparent manufacturers, packaged, labeled, marketed, advertised, supplied, distributed, and sold the product, and EzriRx owned the EzriCare trademark.  As such, Defendants owed Plaintiff a duty of care and a duty to assist and protect, including but not limited to a duty of reasonable care to manufacture, test, design, distribute, package, label, supply, market, advertise, and/or sell a product that was not unreasonably safe for human use.  The product was either inherently dangerous or reasonably certain, if negligently manufactured, designed, distributed, packaged, labeled, supplied, marketed, advertised, and/or sold to place life and limb in peril.  It was or became contaminated with *Pseudomonas aeruginosa*. Defendants were negligent in manufacturing, designing, distributing, packaging, labeling, supplying, marketing, advertising, and/or selling the product. Defendants failed to use the amount of care in manufacturing, distributing, packaging, labeling, supplying, marketing, advertising, and/or selling the product that a reasonably careful manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers would use in similar circumstances to avoid exposing others to a foreseeable risk of harm.  Alternatively, Defendants failed to use any care or made an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to

oneself or to others. Mr. Reynolds believed that EzriCare was the manufacturer of the product. Mr. and Ms. Reynolds were harmed, and Defendants' negligence was a substantial factor in causing that harm.

69.    Global Pharma, EzriCare, and EzriRx also had a duty to properly supervise, train, and monitor its agents, subcontractors, and employees who prepared the product to ensure compliance with Defendants' operating standards and to ensure compliance with all applicable regulations. Defendants failed to properly supervise, train, and monitor these agents, subcontractors, and employees and thus breached that duty. Mr. Reynolds believed that EzriCare was the manufacturer of the product. Mr. and Ms. Reynolds were harmed, and Defendants' negligence was a substantial factor in causing that harm.

70.    Further, Global Pharma was required to follow the laws set forth in California's Sherman Food Drug and Cosmetics Laws. Such laws require, for example, sanitary conditions at the manufacturing facility so that eye drops will be sterile and safe. Cal. Health & Safety Code §§ 110111, 110105 (incorporating 21 U.S.C. Sec. 301 *et seq.* and regulations, including but not limited to 21 C.F.R Parts 200.50, 211 and 21 C.F.R. 820 *et seq.*). Global Pharma violated the laws. Mr. and Ms. Reynolds suffered harm. Mr. and Ms. Reynolds were in the class of persons intended to be protected by the laws that Defendants failed to follow. Global Pharma's violations of the law were a substantial factor in bringing about the harm that Mr. and Ms. Reynolds suffered.

71.    Plaintiff expressly disclaims that this – or any – of its causes of action are brought pursuant to federal law. Plaintiff's claims are based on California law.

72.    On information and belief, certain Defendants acted with malice, oppression, or fraud – including, but not limited to, acting with willful and knowing disregard for the rights or safety of others: Global Pharma, EzriCare, and EzriRx failed to implement protocols to ensure that the product was safe and sterile, while simultaneously representing that the product was safe and in compliance with FDA regulations. These Defendants had awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid those consequences.

**Count V**

**Negligent Failure to Warn**

73.    Mr. & Mrs. Reynolds incorporate the preceding paragraphs 2-8 and 13-54 by reference as though set forth here in their entirety.

74.    Global Pharma, EzriCare, and EzriRx are manufacturers or apparent manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers of the product Artificial Tears.  Global Pharma manufactured, designed, packaged, supplied, distributed, and sold the product; EzriCare and EzriRx were apparent manufacturers, packaged, labeled, marketed, advertised, supplied, distributed, and sold the product, and EzriRx owned the EzriCare trademark.  As such, Defendants owed Plaintiff a duty of care and a duty to assist and protect, including but not limited to a duty of reasonable care to manufacture, test, design, distribute, package, label, supply, market, advertise, and/or sell a product that was not unreasonably safe for human use.

75.    Defendants owed a duty to Plaintiff to comply with all statutory and regulatory provisions that pertained or applied to the manufacture, testing, distribution, storage, labeling, and sale of its products, including all applicable local, state, and federal health and safety regulations – as incorporated into California law.  Defendants failed to conform to this duty.

76.    Defendants knew or reasonably should have known that the product was dangerous or was likely to be dangerous when used or misused in a reasonably foreseeable manner. The product was or became contaminated with *Pseudomonas aeruginosa.*  Defendants knew or reasonably should have known that users would not realize the danger.  Defendants failed to adequately warn of the danger or instruct on the safe use of the product.  A reasonable manufacturer, designer, distributor, packager, labeler, supplier, marketer, advertiser, and/or seller under the same or similar circumstances would have warned of the danger or instructed on the safe use of the product.

77.    Alternatively, Defendants failed to use any care or made an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to oneself or to others.

78.     Mr. Reynolds believed that EzriCare was the manufacturer of the product.  Mr. and Ms. Reynolds were harmed.  Defendants' negligent failure to warn or instruct was a substantial factor in causing the harm suffered by Mr. and Ms. Reynolds.

79.     On information and belief, certain Defendants acted with malice, oppression, or fraud – including, but not limited to, acting with willful and knowing disregard for the rights or safety of others: Global Pharma, EzriCare, and EzriRx failed to implement protocols to ensure that the product was safe and sterile, while simultaneously representing that the product was safe and in compliance with FDA regulations.  These Defendants had awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid those consequences.

**Count VI**

**Negligent Failure to Recall**

80.     Mr. & Mrs. Reynolds incorporate the preceding paragraphs 2-8 and 13-54 by reference as though set forth here in their entirety.

81.     Global Pharma, EzriCare, and EzriRx are the manufacturers or apparent manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers of the product Artificial Tears.  EzriCare and EzriRx were apparent manufacturers, packaged, labeled, marketed, advertised, supplied, distributed, and sold the product, and EzriRx owned the EzriCare trademark.  As such, Defendants owed Plaintiff a duty of care and a duty to assist and protect, including but not limited to a duty of reasonable care to manufacture, test, design, distribute, package, label, supply, market, advertise, and/or sell a product that was not unreasonably safe for human use.

82.     Defendants knew or reasonably should have known that the product was dangerous or was likely to be dangerous when used in a reasonably foreseeable manner.  It was or became contaminated with *Pseudomonas aeruginosa*.  Given that the months-long CDC investigation remained pending prior to the recall, on information and belief, Defendants became aware or should have become aware of this defect after the product was sold.  Defendants failed to recall or warn of the danger of the product.  A reasonable manufacturer, designer, distributor, packager, labeler, supplier, marketer, advertiser, and/or seller under the same or similar circumstances would have

1  recalled the product.  Alternatively, Defendants failed to use any care or made an extreme departure

2  from what a reasonably careful person would do in the same situation to prevent harm to oneself or to

3  others.  Mr. and Ms. Reynolds was harmed. Defendants' failure to recall the product was a substantial

4  factor in causing the harm suffered by Mr. and Ms. Reynolds.

5        83.    On information and belief, Defendants acted with malice, oppression, or fraud –

6  including, but not limited to, acting with willful and knowing disregard for the rights or safety of

7  others: Global Pharma, EzriCare, and EzriRx failed to implement protocols to ensure that the product

8  was safe and sterile, while simultaneously representing that the product was safe and in compliance

9  with FDA regulations Defendants had awareness of the probable dangerous consequences of their

10  conduct and deliberately failed to avoid those consequences.

11  **Count VII**

12  **Breach of Implied Warranty**

13  **[Common Law & California Civil Code § 1792]**

14        84.    Mr. & Mrs. Reynolds incorporate the preceding paragraphs 2-8 and 13-54 by

15  reference as though set forth here in their entirety.

16        85.    Global Pharma, EzriCare, EzriRx, and Amazon are the manufacturers or apparent

17  manufacturers, designers, distributors, packagers, labelers, suppliers, marketers, advertisers, and/or

18  sellers of the product Artificial Tears.  EzriCare and EzriRx were apparent manufacturers, packaged,

19  labeled, marketed, advertised, supplied, distributed, and sold the product, and EzriRx owned the

20  EzriCare trademark; Amazon marketed, advertised, distributed, and sold the product.  Mr. Reynolds

21  bought the product from these Defendants.  At the time of the purchase, these Defendants were in the

22  business of manufacturing, designing, distributing, packaging, labeling, supplying, marketing,

23  advertising, and/or selling the product or held themselves out as having special knowledge or skill

24  regarding these goods.  They warranted that the product complied with FDA regulations, was safe,

25  effective, comparable to Refresh Plus Eye Drops, not adulterated with harmful bacteria, could be used

26  so that it would not become adulterated with harmful bacteria, was prepared under sanitary conditions,

27  and sterile.  The warranted that the product was merchantable and was fit for its ordinary purpose.

28  Instead, the product was or became contaminated with harmful bacteria.  Thus, the product was not of

1  the same quality as those generally acceptable in the trade; was not fit for the ordinary purposes for

2  which such goods are used; was not adequately contained, packaged, or labeled; and did not measure

3  up to the promises or facts stated on the container or label was not merchantable.  Mr. Reynolds

4  believed that EzriCare was the manufacturer of the product.  Mr. and Ms. Reynolds were harmed.

5  The failure of the product to have the expected quality was a substantial factor in causing Mr. and Ms.

6  Reynold's harm.

7       86.    On information and belief, certain Defendants acted with malice, oppression, or fraud

8  – including, but not limited to, acting with willful and knowing disregard for the rights or safety of

9  others: Global Pharma, EzriCare, and EzriRx failed to implement protocols to ensure that the product

10  was safe and sterile, while simultaneously representing that the product was safe and in compliance

11  with FDA regulations.  These Defendants had awareness of the probable dangerous consequences of

12  their conduct and deliberately failed to avoid those consequences.

13                                **Count VIII**

14                                 **Fraud**

15       87.    Mr. & Mrs. Reynolds incorporate the preceding paragraphs 2-8 and 13-54 by

16  reference as though set forth here in their entirety.

17       88.    EzriCare and EzriRx are the manufacturers or apparent manufacturers, designers,

18  distributors, packagers, labelers, suppliers, marketers, advertisers, and/or sellers of the product

19  Artificial Tears.  EzriCare and EzriRx were apparent manufacturers, packaged, labeled, marketed,

20  advertised, supplied, distributed, and sold the product, and EzriRx owned the EzriCare trademark.

21  Those Defendants represented that the product was safe, effective, comparable to Refresh Plus Eye

22  Drops, not adulterated with harmful bacteria, could be used so that it would not become adulterated

23  with harmful bacteria, was prepared under sanitary conditions, and sterile.  More specifically, the

24  brand-name eye drops, Refresh Plus (for which EzriCare is the generic), are sold in *single-use* vials to

25  protect from contamination, *not* a multidose bottle, like Artificial Tears.  If eye drops are sold in a

26  multi-dose container, like EzriCare's, they must either contain a substance to inhibit the growth of

27  microorganisms *or* "be so packaged as to volume and type of container and so labeled as to duration

28  of use and with such necessary warnings to afford adequate protection and minimize the hazard of

1    injury resulting from contamination during use."  Cal. Health & Safety Code §§ 110111, 110105

2    (incorporating 21 C.F.R. 200.50(b)).  Thus, Artificial Tears was not comparable to Refresh Plus Eye

3    Drops.  Moreover, the product was or became contaminated with harmful bacteria – or EzriCare and

4    EzriRx concealed information regarding the same.  As such, Defendants' representation was false.

5    Defendants knew that the representation was false when they made it, or they made the representation

6    recklessly and without regard for its truth.  Alternatively, though Defendants may have honestly

7    believed that the representation was true, Defendants had no reasonable grounds for believing the

8    representation was true when they made it.  Defendants intended for Mr. Reynolds to rely on the

9    representation, and he did reasonably rely on the representation.  Mr. and Ms. Reynolds were harmed.

10   Mr. Reynold's reliance on Defendants' representation was a substantial factor in causing the harm.

11   　　　　89.    On information and belief, certain Defendants acted with malice, oppression, or fraud

12   – including, but not limited to, acting with willful and knowing disregard for the rights or safety of

13   others:  Global Pharma, EzriCare, and EzriRx failed to implement protocols to ensure that the product

14   was safe and sterile, while simultaneously representing that the product was safe and in compliance

15   with FDA regulations.  These Defendants had awareness of the probable dangerous consequences of

16   their conduct and deliberately failed to avoid those consequences.

17   　　　　　　　　　　　　　　　　　　**Count IX**

18   　　　　　　　　　　　　　　　**Loss of Consortium**

19   　　　　90.    Mr. & Mrs. Reynolds incorporate the preceding paragraphs 2-8 and 13-54 by

20   reference as though set forth here in their entirety.

21   　　　　91.    Mr. and Mrs. Reynolds are married and were married at all times relevant to this

22   lawsuit.  Ms. Reynolds was harmed by the injury that Mr. Reynolds suffered because he used

23   Artificial Tears, as alleged herein.  Ms. Reynolds suffered loss of love, companionship, comfort,

24   care, assistance, protection, affection (both physical and emotional), society, and moral support.

25   For example, the injuries have caused Mrs. Reynolds spend more time caretaking, thus putting

26   undue strain on the marital relationship.  Seeing her husband suffer is emotionally taxing. Further,

27   because of Mr. Reynolds' injuries, they can no longer even sleep in the same bed for fear of

28

1    exacerbating the injuries.  This loss of consortium was proximately caused by the injury that Mr.

2    Reynolds suffered when he used Artificial Tears.

3                                            **DAMAGES**

4         92.    Mr. and Mrs. Reynolds incorporate the preceding paragraphs by reference as though

5    set forth here in their entirety.  Defendants' conduct was a direct, proximate, and producing cause of

6    Plaintiff's injuries and damages, including but not limited to damages in the past and future, including

7    but not limited to: pain and suffering, mental anguish, emotional distress, physical impairment,

8    physical disfigurement, loss of enjoyment of life, medical and pharmaceutical expenses, travel and

9    travel-related expenses, emotional distress, lost wages, lost earning capacity, punitive and/or

10   exemplary damages and attorneys' fees (to the extent recoverable) and other general, special,

11   ordinary, incidental and consequential damages as would be anticipated to arise under the

12   circumstances.  On information and belief, Defendants acted with malice, oppression, or fraud –

13   including, but not limited to, acting with willful and knowing disregard for the rights or safety of

14   others, for example, including but not limited to, in failing to test for bacteria.  Defendants had

15   awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid

16   those consequences.

17

18                                    **PRAYER FOR RELIEF**

19        93.    WHEREFORE Plaintiffs pray for the following:

20        1.  Past and future economic and non-economic damages, general and specific
              damages, in an amount to be determined at trial;

21
22        2.  Punitive damages;

23        3.  Such other sums as shall be determined to fully and fairly compensate Plaintiffs for
              all general, special, incidental, and consequential damages incurred or to be
24            incurred as the direct and proximate result of the acts and omissions of Defendants;

25        4.  Costs, disbursements, and reasonable attorneys' fees to the extent allowed by law;

26        5.  Pre- and post-judgment interest at the highest rate allowed by law;

27        6.  That the Court award such other and further relief as it deems necessary and proper
              in the circumstances; and

28
          7.  That the Court award Plaintiffs the opportunity to amend or modify the provisions

of this Complaint as necessary or appropriate after additional or further discovery is completed in this matter, and after all appropriate parties have been served.

## JURY TRIAL DEMAND

94.    Plaintiffs demand a jury trial on all of the issues raised in this Complaint.

Dated:  June 9, 2023

Respectfully submitted,

THE LANIER LAW FIRM

/s/      Rachel Lanier
Rachel Lanier (SBN 343171)
Michael Akselrud (SBN 285033)
LANIER LAW FIRM, PC
2829 Townsgate Road, Suite 100
Westlake Village, CA 91361
Tel: 310.277.5100
Rachel.Lanier@LanierLawFirm.com
Michael.Akselrud@LanierLawFirm.com

*Attorneys for Plaintiffs*
*Milton & Danae Reynolds*

FIRST AMENDED COMPLAINT FOR DAMAGES

1

<u>**CERTIFICATE OF SERVICE**</u>

2

I, Maral Jamgochian, declare as follows:

3

I am employed in the County of Harris, State of Texas, I am over the age of eighteen years and am not a party to this action; my business address is 10940 W. Sam Houston Pkwy, Suite 100, Houston, TX 77064, in said County and State. On June 9, 2023, I served the following document(s):

4

5

**FIRST AMENDED COMPLAINT FOR DAMAGES**

6

on the parties stated below, by the following means of service:

7

**Attorneys for Defendant Amazon.com, Inc.**

8

Julie L. Hussey, Bar No. 237711
JHussey@perkinscoie.com

9

Jacob L. Speckhard, Bar No. 325030
JSpeckhard@perkinscoie.com

10

Melissa Harly Rose, Bar No. 316412
MRose@perkinscoie.com

11

PERKINS COIE LLP
11452 El Camino Real, Suite 300

12

San Diego, California 92130-2080
Telephone: 858.720.5700

13

Facsimile: 858.720.5799

14

**Attorneys for Defendants EZRICARE LLC. AND EZRIRX, LLC**

15

EDWARD B. GAUS (SBN 289561)
egaus@shb.com

16

DAVID L. POLYAKOV (SBN 341577)
dpolyakov@shb.com

17

SHOOK, HARDY & BACON L.L.P.

18

555 Mission Street, Suite 2300
San Francisco, CA 94105

19

Telephone: 415-544-1900
Facsimile: 415-381-0291

BRYAN T. PRATT (*pro hac vice*)
bpratt@shb.com
ADRIENNE L. BYARD (*pro hac vice*)
abyard@shb.com
SHOOK, HARDY AND BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
Telephone: (816) 474-6550

20

[ **X** ]   **BY MAIL**:    I caused such envelope(s) to be deposited in the mail at Houston, Texas with postage thereon fully prepaid to the office of the addressee(s) as indicated on the attached service list. I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

21

22

23

24

[ **X** ]   **BY ELECTRONIC SERVICE**: On the above-mentioned date, I caused the documents to be sent to the persons at the electronic notification addressed as shown above.

25

26

I declare under penalty of perjury, under the laws of the State of California that the above is true and correct.

27

Executed this 9th day of June, 2023 at Houston, Texas.

28

*/s/ Maral Jamgochian*
Maral Jamgochian

- 32 -

FIRST AMENDED COMPLAINT FOR DAMAGES